RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0197p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EDWARD GODAWA and TINA GODAWA,
Administrators of the Estate of Michael Godawa,

> *Plaintiffs-Appellants,*

> *v.*

DAVID BYRD,

> *Defendant-Appellee.*

No. 14-5963

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:12-cv-00170—William O. Bertelsman, District Judge.

Argued: April 28, 2015

Decided and Filed: August 19, 2015

Before: CLAY, KETHLEDGE, and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:** Christopher D. Roach, THE DETERS FIRM, Cincinnati, Ohio, for Appellants. Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellee. **ON BRIEF:** Christopher D. Roach, THE DETERS FIRM, Cincinnati, Ohio, for Appellants. Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellee.

---

## OPINION

---

CLAY, Circuit Judge. Plaintiffs Edward and Tina Godawa, as administrators of the estate of their son Michael Godawa, appeal from the district court's August 1, 2014 order and judgment granting in part Defendant David Byrd's motion for summary judgment, dismissing

with prejudice Plaintiffs' federal claims and state loss of consortium claim, and dismissing without prejudice Plaintiffs' other state law claims.  Plaintiffs argue that Defendant is not entitled to qualified immunity on Plaintiffs' 42 U.S.C. § 1983 excessive force claim.

For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## BACKGROUND

### A.  Procedural Background

Plaintiffs are the parents of Michael Godawa ("Godawa"), a young man who was fatally shot by a police officer, Defendant David Byrd, while attempting to flee from an arrest. Plaintiffs filed an amended complaint in this case on December 27, 2012, raising federal and state law claims including a 42 U.S.C. § 1983 excessive force claim.  Following the completion of discovery, both Plaintiffs and Defendant filed motions for summary judgment.  The district court heard oral argument on these motions on June 27, 2014.  On August 1, 2014, the court issued a memorandum opinion and order denying Plaintiffs' motion for summary judgment and granting Defendant's motion for summary judgment in part.  The district court dismissed Plaintiffs' federal claims and state loss of consortium claim with prejudice and dismissed Plaintiffs' other state law claims without prejudice.  Plaintiffs timely appealed.  This appeal exclusively addresses Plaintiffs' § 1983 excessive force claim.

### B.  Factual Background

This case is about an incident that occurred at approximately 1:00 a.m. on June 23, 2012, during which Defendant fatally shot Godawa as he was attempting to flee Defendant in a vehicle. The evidence regarding this incident is primarily comprised of: (1) video footage from Defendant's lapel camera, (2) surveillance video from the Finish Line Bar and Grill ("Finish Line"), and (3) Defendant's deposition.  On the evening in question, Defendant was serving on bicycle patrol as a police officer for the city of Elsmere, Kentucky.  According to Defendant, at approximately 1:00 a.m., he was approached by a Finish Line employee who was concerned that an individual walking around the parking lot was underage and drinking.  The individual, who was later identified as Godawa, got into a vehicle and drove from the back of the parking lot to

the front of the parking lot. Defendant approached the vehicle and asked Godawa if he had been drinking. Godawa claimed he had not been drinking. Defendant inquired about a bottle of beer that was visible in the vehicle's cup holder, and Godawa identified the beer as belonging to his girlfriend who was inside the bar.

After expressing disbelief that the beer belonged to Godawa's girlfriend, Defendant asked Godawa for identification. Godawa informed Defendant that he had a driver's license but that the license was not in his possession at the time. Defendant asked Godawa if he would be willing to submit to a field sobriety test. Godawa initially stated that he did not want to take a field sobriety test because he was nervous and afraid he would fail. At that point, Defendant asked Godawa to wait in the car while he went to his bicycle to get a notepad and pen. After walking to his bicycle, Defendant returned to the vehicle and asked for Godawa's name and social security number. Godawa answered Defendant's questions and provided his identifying information.

Defendant once again asked Godawa whether he had been drinking, and Godawa replied that he had consumed one or two drinks. He also admitted that the beer in the car belonged to him and not to his girlfriend. He claimed to have lied earlier because he was scared. Godawa then agreed to submit to a field sobriety test. Defendant told Godawa to "hold on" and went to his bicycle to request backup for the performance of the field sobriety test.

While Defendant was still at his bicycle, Godawa started his vehicle and began to back out of the parking spot. In the process of backing out of the parking spot, Godawa appears to hit or knock over Defendant's bicycle. Defendant yelled "Hey" and "Stop" multiple times, but Godawa did not stop. In his deposition, Defendant claims that he then "ran along the driver's side of the vehicle to the front of the vehicle and ordered [Godawa] to stop the car." (R. 26-1, Byrd Deposition, Page ID # 202-03.) Defendant had his gun drawn as he ran to the front of Godawa's car and positioned himself ahead and to the right of the car's front passenger side while the car was temporarily stopped. In the moments that followed, Defendant and Godawa's car appear to have come into contact—though precisely how is disputed by the parties.

The moment of impact is not clearly depicted in either video. Plaintiffs contend that Defendant was moving toward the car just prior to the impact "to block the exit," whereas

Defendant claims that he was "target[ed]" by Godawa. *Appellant's Br.* at 7; *Appellee's Br.* at 7. While the lapel video clearly shows that Defendant and the vehicle came closer to each other, it is difficult to discern whether the car was driving toward Defendant, whether Defendant was moving toward the car, or both. In the Finish Line surveillance video, the precise moment of impact occurs just off-screen. In the seconds leading up to the impact, Defendant can be seen ahead and to the right of the front passenger side of Godawa's car. The car appears temporarily stopped at that point, having just finished backing out of a parking spot. As the car begins to pull forward, Defendant is seen advancing toward the car. The car then makes a right turn in the direction of the parking lot exit and, in the middle of the turn, Defendant seems to make contact with the car just off camera. This contact is suggested by Defendant's re-emergence on the video in which he seems to be moving off or pushing off the car and landing unsteadily on his feet. In his deposition, Defendant claimed that he was hit by Godawa's car "in the left leg about the knee" while the car was traveling at a speed of five to ten miles per hour. (R. 26-1, Byrd Deposition, Page ID # 204-05.) Defendant regains his balance quickly and appears to take three strides alongside the vehicle before shooting through the rear passenger-side window.

Photographs taken at the scene also indicate that the bullet that hit Godawa went through the back passenger-side window. Autopsy photos reveal that the bullet entered Godawa's body through the back of his right shoulder and traveled diagonally to the center left side of his chest.

After being shot, Godawa turned left out of the parking lot and drove south on Dixie Highway. Defendant can be heard on the video calling for backup, saying that shots had been fired. He can also be heard saying, "He ran over my bike, tried to hit me." (R. 21-1, Lapel Video, 1:28:07-08.) Soon after turning onto Dixie Highway, Godawa turned around in a different parking lot and drove back toward Finish Line. When the car passed by Defendant, who was standing in the middle of Dixie Highway with his gun drawn, he observed that Godawa was "slumped over the steering wheel and appeared to be injured." (R. 26-1, Byrd Deposition, Page ID # 209.) Godawa's vehicle struck a utility pole at the next intersection. Two other police officers arrived soon after, and Defendant rode his bicycle to where the car had stopped.

Emergency medical technicians were dispatched to the scene. Despite their efforts, Godawa subsequently died from "exsanguination due to perforation of the right lung" caused by the gunshot wound. (R. 54-1, Hamilton County Coroner's Report, Page ID # 801.)

**DISCUSSION**

**A. Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if the materials in the record "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (internal quotation marks omitted). "[I]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)). We view all facts and related inferences in the light most favorable to the non-moving party and review all questions of law *de novo. Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008).

**B. Analysis**

Public officials are entitled to qualified immunity in cases seeking civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is intended to protect public officials from unnecessary interference with their duties, while also holding them accountable "when they exercise power irresponsibly." *Id.* The qualified immunity analysis entails two general steps, which can be considered in any order. *Pearson,* 555 U.S. at 236. In one step, the court determines whether "the facts alleged show the officer's conduct violated a constitutional right"; in the other, it determines whether the right was "clearly established" at the time of the events. *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014) (citing *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001)).

**1. Factual Record Taken in the Light Most Favorable to Plaintiffs**

As was previously noted, we must consider the facts in the light most favorable to Plaintiffs and make all reasonable inferences in their favor when undertaking the qualified immunity analysis on summary judgment. *Davenport*, 521 F.3d at 550. Defendant in the instant case claims that Plaintiffs' version of events, particularly with respect to the nature of the impact between Defendant and Godawa's car, cannot be credited because the video evidence "blatantly contradicts" Plaintiffs' account. *Appellee's Br.* at 15. We disagree and find that the video evidence does not clearly contradict Plaintiffs' version of events.

Defendant seeks to support his argument by likening this case to *Scott v. Harris*, 550 U.S. 372 (2007). In *Scott*, the Supreme Court found that a police officer was entitled to qualified immunity in a Fourth Amendment excessive force claim. In so doing, the Court rejected the plaintiff's factual account due to the existence of a videotape that captured the relevant events and "quite clearly contradict[ed]" the plaintiff's story such that "no reasonable jury could believe it." *Id.* at 378, 380. That is not the case here. Contrary to Defendant's claim, the video evidence in this case does not clearly contradict Plaintiffs' version of events, nor does it necessarily support Defendant's assertion that Godawa's vehicle "target[ed]" him. *Appellee's Br.* at 7. Specifically, both videos can reasonably be interpreted as indicating that Defendant was not directly in front of the vehicle, but rather was located ahead of the vehicle *to the right* of the passenger side during the relevant timeframe, and that the car never "targeted" Defendant. Moreover, based on the Finish Line surveillance footage and the nature of the movement depicted in the lapel video, it appears possible—and arguably likely—that Defendant was moving toward the car with his gun drawn in the moments before the apparent impact. A reasonable juror observing the video evidence could conclude that Defendant initiated the contact with Godawa's car in an apparent attempt to stop Godawa from fleeing the parking lot.

With regard to the shooting, the Finish Line surveillance video may be reasonably interpreted as indicating that Defendant was effectively chasing Godawa's car before he fired the shot that killed Godawa and that he was not in harm's way at that critical moment. Accordingly, for the purposes of the following analysis, we assume that Defendant was not actively struck by Godawa's car, but initiated the impact with the vehicle in his efforts to keep Godawa from

fleeing. Under this factual account, Godawa did not pose an immediate threat at the time Defendant discharged his weapon.

### 2. Constitutional Right

The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers. *Cass*, 770 F.3d at 374. Nonetheless, the government has a "right to use some degree of physical coercion or threat thereof" to effectuate an arrest. *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Claims alleging the use of excessive force during an arrest are considered under the Fourth Amendment's "objective reasonableness" standard. *Graham*, 490 U.S. at 388. Under this standard, a court considers whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This analysis entails a balancing of the following three factors articulated by the Supreme Court in *Graham*: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights,* 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396).

It is well established that courts should consider the reasonableness of an officer's use of force from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. In so doing, the objective reasonableness determination should account for the fact that, when faced with "rapidly evolving" and tense situations, "police officers are often forced to make split-second judgments" in deciding how much force is necessary given the circumstances. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014).

If an officer "has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent [the suspect's] escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In contrast, where a suspect "poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."

*Id.* Where a suspect is attempting to flee in a vehicle, police officers are "justified in using deadly force against a driver who objectively appears ready to drive into an officer or bystander with his car. But, as a general matter, an officer may not use deadly force once the car moves away, leaving the officer and bystanders in a position of safety." *Cass,* 770 F.3d at 375 (internal quotation marks and citations omitted) (affirming a grant of summary judgment on the basis of qualified immunity where the officer shot a fleeing suspect after the suspect accelerated towards a police officer and struck two officers). An officer may, however, "continue to fire at a fleeing vehicle even when no one is in the vehicle's direct path when the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car." *Id.* (internal quotation marks omitted). Still, where the car no longer "presents an imminent danger," an officer is not entitled to use deadly force to stop a fleeing suspect. *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005).

In evaluating whether Defendant's conduct was objectively reasonable in the case at hand, our previous decision in *Cupp* is directly on point. In *Cupp*, we considered facts that bear significant resemblance to key facts in this case and concluded that an officer was not entitled to qualified immunity for his use of deadly force against a man fleeing in a car. In that case, the defendant police officer arrested Smith, whom the officer perceived to be intoxicated, for making harassing phone calls in the officer's presence. *Id.* at 769. The officer placed Smith in the back of a police cruiser while he went to speak with a tow truck driver about removing Smith's vehicle. Although he had previously been compliant, Smith crossed from the back seat into the front seat and began to flee the scene in the police cruiser. Smith maneuvered the cruiser such that he was driving toward the officer and the tow truck driver. The officer moved out of the way of the vehicle and, as the car passed him, he fired four shots, killing Smith. The officer claimed that Smith had directed the cruiser at him and at the tow truck driver, and that he shot Smith in "self-defense as the cruiser was bearing down on them." *Id.* at 770. The tow truck driver stated that Smith may have redirected the car in order to follow the natural direction of the roadway, rather than to target the officer and himself. Additionally, the tow truck driver stated that the officer was actually "running toward the patrol car" when he shot Smith. *Id.* at 774.

Considering these circumstances, we concluded that, under the plaintiffs' version of the facts, the officer's actions violated Smith's constitutional rights. We explained:

> According to the plaintiffs' evidence, [the officer] shot Smith after the police cruiser was past [the officer] and there was no immediate danger to anyone in the vicinity. [The officer's] use of force was made even more unreasonable by the fact that Smith had been cooperative up to this point, and was arrested for the nonviolent offence of making harassing phone calls. Although there was some danger to the public from Smith's driving off in a stolen police car, the danger presented by Smith was not so grave as to justify the use of deadly force.

*Id.* at 773. Of particular concern to us in *Cupp* was the fact that, under the plaintiffs' version of events, neither the officer nor any bystanders were in danger at the time that the officer shot Smith. We therefore determined that, while the officer "[was] constitutionally permitted to put himself in a dangerous position in order to effectuate an arrest," a reasonable officer in his position "would not have perceived danger to anyone at the scene," including himself, under the plaintiffs' interpretation of the evidence. *Id.* at 774. The plaintiffs presented witness testimony that the officer had taken "four or five steps" toward the side of the patrol car before firing his gun, and that he was in fact running toward the car. That evidence suggested that the officer was not in danger and did not need to "use deadly force to protect himself or others." *Id.*

In reaching our holding, we recognized that, "[a]lthough this circuit's previous cases give substantial deference to an officer's decision to shoot an unarmed suspect in a car chase, the officer must have reason to believe that the car presents an imminent danger." *Id.* at 775. The situation presented in *Cupp* "d[id] not present 'a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer.'" *Id.* (quoting *Sample v. Bailey,* 409 F.3d 689, 697 (6th Cir. 2005)).

The same reasoning applies equally in the present case. As in *Cupp*, viewing the facts in the light most favorable to Plaintiffs, Godawa never attempted to hit Defendant with his car and did not drive in a manner that endangered Defendant's life. *Cf. Cass*, 770 F.3d at 375 (holding that a police officer may be justified in firing at a fleeing vehicle even where there is no one in the vehicle's path if the "officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car"). Rather, Defendant actively "put himself in a dangerous position in order to effectuate an arrest" by running alongside the car and using his

body to try to block the exit. *Cupp*, 430 F.3d at 774. Likewise, Defendant was not in front of the car, but instead was positioned near the rear passenger side, at the time that he fired his weapon. From that position, Defendant would have had no reason to fear being struck by the car as it continued to advance. Defendant emphasizes how fast the events transpired, noting that he had "less than two seconds to process being physically assaulted by a vehicle." *Appellee's Br.* at 26. Under Plaintiffs' version of the facts, however, Defendant was not in danger. And critically, the fact that a situation is rapidly evolving "does not, by itself, permit [an officer] to use deadly force." *Cupp*, 430 F.3d at 775.

In reaching our holding in *Cupp*, we distinguished *Brosseau v. Haugen*, 543 U.S. 194 (2004). The present case is similarly distinguishable from *Brosseau*. In *Brosseau*, the Supreme Court reversed a denial of qualified immunity for a police officer who had shot a suspected felon while he was attempting to evade arrest and flee in a vehicle. *Id*. at 195-96. The Court found that the suspect posed "a major threat" to others, including officers located at the end of the street. *Id*. at 200. Whereas Godawa was suspected of nothing more than drinking underage and having an open container in his car, the fleeing driver in *Brosseau* "was a suspected felon with a no-bail warrant out for his arrest, with whom [the officer] had experienced a violent physical encounter prior to the shooting." *Cupp*, 430 F.3d at 776. Additionally, the "undisputed facts [in *Brosseau*] showed that the shooting officer believed the suspect had a gun and was fearful for officers in the immediate area." *Id*. In contrast, Godawa never displayed any violence in his interactions with Defendant and never engaged Defendant in a physical struggle. Critically, unlike the fleeing suspect in *Brosseau*, Godawa posed no discernable threat to the officers or to any other individuals at the time he was shot.

Prior to Godawa's flight, Defendant only suspected him of having an open container in his car and underage drinking. Even so, the district court in this case determined that, in addition to the alcohol offenses, "at the time the fatal shot was fired, the officer had probable cause to believe Godawa committed a number of violent and serious offenses, including attempted murder, first degree assault, wanton endangerment in the first degree, and fleeing and evading in the first degree." (R. 66, Memorandum Opinion and Order, Page ID # 885-86.) Police officers are entitled to consider felonies committed by a fleeing suspect after the flight has commenced in

determining the appropriateness of using deadly force. *See Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 156 (6th Cir. 2013). The district court, however, did not view the facts in the light most favorable to Plaintiffs in reaching its conclusion, and instead based its determination on a factual account that assumed Godawa had actively struck Defendant with his car. With the exception of fleeing and evading arrest, none of the offenses listed by the district court are applicable once the facts are viewed in the light most favorable to Plaintiffs, as we are required to do.

Defendant cites to the Supreme Court's decisions in *Scott* and *Plumhoff* to support the argument that his behavior was objectively reasonable. Neither case supports Defendant's position. Both *Scott* and *Plumhoff* addressed police officers' use of deadly force to stop fleeing suspects who were engaged in high speed chases and whose recklessness had endangered police and bystanders. In Scott, the officer rammed a fleeing suspect's car from behind to end a chase after the suspect had driven at high speeds, collided with a police cruiser during the chase, and generally had driven "so recklessly" that he was "placing police officers and innocent bystanders alike at great risk of serious injury." *Scott*, 550 U.S. at 380, 385. Similarly, in *Plumhoff*, the fleeing suspect sustained a high speed chase in which he attained speeds exceeding 100 miles per hour, collided with police cruisers, and nearly hit a police officer in attempting to continue his flight. Throughout that chase, the fleeing suspect's "outrageously reckless driving posed a grave public safety risk." *Plumhoff*, 134 S. Ct. at 2021. The Court concluded that, "[u]nder the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [the suspect] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id*. at 2022.

*Scott* and *Plumhoff* establish that, where a fleeing driver is imperiling the lives of officers or the public, it will generally be objectively reasonable for a police officer to employ deadly force to end the flight. However, these cases simply do not stand for the proposition that an officer may reasonably use deadly force against a fleeing motorist where no such peril or risk exists. Applying the *Graham* factors to the Plaintiffs' facts, we conclude that Defendant's use of force in this case was objectively unreasonable; although he was fleeing from police, Godawa was suspected of only minor offenses and posed no "immediate threat" to Defendant or any

member of the public.   *See Martin*, 712 F.3d at 958 (quoting *Graham*, 490 U.S. at 396) (identifying *Graham* factors as "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight").   In light of this Circuit's on-point precedent and critical differences between the facts of this case and the facts of the cases relied upon by Defendant, we conclude that a reasonable jury could find that Defendant's use of force violated Godawa's Fourth Amendment rights.

### 3.  Clearly Established Right

The qualified immunity analysis does not end with the determination that, under the facts alleged, Defendant's use of force was objectively unreasonable.   We must also determine whether the constitutional right being violated was clearly established at the time of the incident. *Pearson,* 555 U.S. at 231.   The Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality."  *Plumhoff*, 134 S. Ct. at 2023.   An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Id.*

It is clearly established law that the "[u]se of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."   *Garner*, 471 U.S. at 11.   Relying on *Brosseau*, the *Plumhoff* Court concluded that, as of 2004, "it was *not* clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger."  *Plumhoff*, 134 S. Ct. at 2023 (emphasis added).   Accordingly, the *Plumhoff* Court determined that in order to defeat the defendant's qualified immunity and demonstrate a clearly established right, the plaintiff in *Plumhoff* would need to show *either* (1) that the officer's conduct was "materially different from the conduct in *Brosseau*," or (2) that between February 21, 1999, when the events in *Brosseau* took place, and the date of the events at issue in *Plumhoff*, "there emerged either 'controlling authority' or a 'robust consensus of cases of persuasive authority,' that would alter [the] analysis of the qualified immunity question."  *Id.* at 2024 (internal quotation marks and citations omitted).   The Court ultimately determined that the

plaintiff could not meet either requirement and thus failed to demonstrate a relevant clearly established right.  *Id.*

Applying the same requirements in this case leads to the opposite outcome.  First, as was addressed above, this case relates to "materially different" conduct than was at issue in *Brosseau* and subsequent cases including *Scott*.  Namely, under Plaintiffs' factual account, Defendant had no reason to believe that Godawa presented "an actual and imminent threat to the lives of [any officers or civilians]" at the time of the shooting.  *Scott*, 550 U.S. at 384.  Second, this Court's decision in *Cupp* established controlling authority that affects the relevant qualified immunity analysis in this case.  The Court in *Brosseau* explicitly recognized that determining whether a right is clearly established requires a "particularized" analysis, and that "this area is one in which the result depends very much on the facts of each case."  *Brosseau*, 543 U.S. at 200-01.  *Cupp* addressed materially similar facts to the case at hand and established clear and controlling precedent that in a comparable situation to the circumstances facing Defendant, the use of deadly force violates the Fourth Amendment.  No subsequent controlling precedent has diminished the clarity of *Cupp*'s holding or its applicability to the present case.

In sum, a genuine dispute of material fact exists regarding the circumstances of Defendant's impact with Godawa's vehicle.  Under Plaintiffs' version of the facts, a reasonable juror could conclude that Defendant's use of deadly force violated Godawa's clearly established constitutional rights under the Fourth Amendment.  Consequently, Defendant is not entitled to summary judgment, and the district court erred in granting qualified immunity to Defendant.

**CONCLUSION**

For the foregoing reasons, we **REVERSE** the order and judgment of the district court and **REMAND** this case for further proceedings consistent with this opinion.