NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0283n.06
No. 16-1583

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DENISE ALEXANDER, Personal Representative of the Estate of James Lee Alexander, Jr., | ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| COUNTY OF WAYNE, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendant, | ) ) | |
| and | ) ) | |
| RICH MERROW, | ) ) | |
| Defendant-Appellee. | ) ) | |

BEFORE: GUY, CLAY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Denise Alexander, personal representative of the estate of James Lee Alexander, Jr., appeals the district court's grant of summary judgment based on qualified immunity in favor of defendant Sergeant Rich Merrow of the Wayne County Sheriff's Office. We affirm.

In January 2012, Sergeant Merrow saw James Alexander leave a suspected drug house. Merrow followed and initiated a traffic stop after observing Alexander drive without a seatbelt and without using turn signals. At first, Alexander cooperated. When he learned Merrow was impounding his car, however, Alexander started the vehicle and shut the driver's side door.

Merrow repeatedly tried to open the driver's side door and warned Alexander to get out of the car and not "do this," but Alexander kept pulling the door shut.

When Merrow saw Alexander put the car in drive, Merrow reached inside and grabbed the steering wheel, hoping to direct the car into a parked vehicle if Alexander tried to flee. Alexander then overpowered Merrow by turning the wheel to the left and pulled out into the street. The car hit Merrow on his left side as it turned in front of him, forcing him off balance. As the car picked up speed, Merrow lost his footing and the car began dragging him backwards down the street. Merrow hung onto the wheel, "scared to death" he would be run over. Eyewitnesses were unequivocal that Merrow was being dragged and in mortal danger. Alexander gave no indication he would stop the car. Believing there was no other way to stop the vehicle, Merrow fired his gun into the car twice, killing Alexander.

Denise Alexander brought this 42 U.S.C. § 1983 action claiming Merrow used excessive force when he shot and killed Alexander. Plaintiff argues Alexander was non-threatening and non-violent when he fled the traffic stop, and Officer Merrow merely "lost his footing and fell down." The district court applied the factors established in *Graham v. Connor*, 490 U.S. 386, 397 (1989), and properly considered Merrow's reasonableness under the totality of the circumstances he faced at the time he decided to use force: while Alexander was dragging Merrow backwards alongside his car onto a public road. *See Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406–07 (6th Cir. 2007) (describing the "segmented analysis" this court uses to analyze use-of-force claims).[1] As plaintiff never presented any evidence refuting that

---

[1]Our dissenting colleague faults Officer Merrow for his actions preceding the shooting. As the district court recognized, however, this court does not scrutinize whether it was reasonable for the officer "to create the circumstances" that led to the use of force. *Livermore*, 476 F.3d at 406 (quotation marks and citations omitted). Instead, we focus on whether the officer's actions were objectively reasonable under the totality of the circumstances he faced "at

Alexander's car was dragging Merrow and that Merrow was at significant risk of injury or death, the district court properly held that Merrow was "entitled to qualified immunity because the undisputed facts establish[ed] that, as a matter of law, he did not violate Alexander's Fourth Amendment right to be free from excessive force." We agree with the district court.

We have reviewed the record on appeal and had the benefit of oral argument. Because the district court fully articulated the reasons why judgment should be entered for Merrow, a detailed opinion by this court would be duplicative and serve no useful purpose. Accordingly, we adopt the analysis and conclusions of the district court and affirm on the basis of its April 14, 2016, opinion.

---

the time [he] made [his] split-second judgment[] immediately prior to using deadly force." *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009).

**CLAY, Circuit Judge, dissenting.**

Even though it has been over half a century since Martin Luther King, Jr., gave his powerful "I Have A Dream" speech, we continue to have an epidemic of unjustified and race-related police shootings in the United States. For instance, the New York Times reported that, "[a]ccording to the F.B.I.'s Supplementary Homicide Report, 31.8 percent of people shot by the police were African-American, a proportion more than two and a half times the 13.2 percent of African-Americans in the general population." Sendhil Mullainathan, *Police Killings: What the Data Says*, N.Y. Times, October 18, 2015, at BU6. Similarly, ProPublica reported that "[y]oung black males in recent years were at a far greater risk of being shot dead by police than their white counterparts—21 times greater, according to a ProPublica analysis of federally collected data on fatal police shootings" from 2010 to 2012. Ryan Gabrielson, Ryann Grochowski Jones, and Eric Sagara, *Deadly Force, in Black and White*, ProPublica (April 21, 2017, 3:55 PM), https://www.propublica.org/article/deadly-force-in-black-and-white.

It is against this backdrop that we consider how the shooting of James Alexander, Jr., a young African-American man, may have been just another example out of countless others that demonstrate the pervasive and systemic racism so often evident in interactions between the police and people of color. As discussed in detail below, rather than placing this case in its proper context, the majority and the district court have treated this case so cavalierly that any concept of justice has been tossed aside. A key issue in this case is whether it was objectively reasonable for Officer Merrow to needlessly escalate the situation by grabbing onto the steering wheel of Alexander's vehicle and attaching his body to the side of the moving vehicle where nothing more was at stake than a minor ticket citation. The majority, in adopting the district court's opinion, frames the issue as whether it was reasonable for Merrow to use deadly force

against Alexander while he was being "dragged alongside Alexander's vehicle." (R. 25, District Court's Opinion, Page ID # 411.) By doing so, the majority completely fails to take into account the totality of the circumstances that the shooting involved. Taking those circumstances into account, there is no acceptable justification for affording Merrow qualified immunity. Before proceeding with the analysis, it will be useful to briefly recount the facts.

**BACKGROUND**

In its opinion, the district court concluded that Merrow was "entitled to qualified immunity because the undisputed facts establish that, as a matter of law, he did not violate Alexander's Fourth Amendment right to be free from excessive force." (R. 25 at 409.) Applying the factors set out in *Graham v. Connor*, 490 U.S. 386 (1989), the district court found that: (1) the crime of attempting to flee the scene was a serious crime; (2) Alexander posed an immediate and substantial threat to the safety of both Merrow and others; and (3) at the time he was shot, Alexander was attempting to evade Merrow by fight. The factual bases for the district court's conclusions in this regard are inadequate, or unsupportable, as will be addressed below.

On January 30, 2012, Merrow was parked outside a suspected drug house in Detroit when he claims that he observed Alexander exit the house and enter a parked car. Merrow initiated a traffic stop after he allegedly observed Alexander driving without a seatbelt and making a turn without using a turn signal. After Alexander pulled to the side of the road, Merrow approached his vehicle and asked Alexander for his driver's license, which was provided. Merrow then questioned Alexander about his visit to the house, and claims that Alexander eventually admitted that he had previously purchased drugs from an individual there and that he had returned to the house to pay off a drug debt. Based on this alleged admission, Merrow decided to impound Alexander's vehicle pursuant to the county's public nuisance laws. Alexander exited his car and

filled out the impound paperwork. Once Alexander completed the paperwork, Merrow says he asked Alexander if there was anything in the vehicle he needed to retrieve.

According to Merrow, Alexander re-entered his vehicle, initially searched around his vehicle for items, and then put the car in drive and attempted to flee. Merrow testified that:

> So Mr. Alexander steps back into the vehicle completely, the driver's side door is open, and he's going through the glove box, grabbing paperwork. He's fumbling with some paper on the passenger seat as well, and then he looks over at me, and then he takes the door, driver door, and he shuts the door and starts his car simultaneously, and that's when I asked him, "What are you doing?"
>
> He says, "You can't hold my car. You can't take my car for buying drugs. My wife will divorce me."
>
> Now I'm telling him, "It's not worth it. Don't do this. Get out of the car." I attempt to open up the driver's door again with my hand from the outside. He slammed it shut again, and again I'm telling him several directives, "Don't do this. Step out of the vehicle. Get out of the car. Don't do this."

(R. 21-1, Merrow Dep. Tr., Page ID # 377.) As Alexander put the car in drive, Merrow, who was standing next to the driver's side of Alexander's vehicle, claims that he tried to open the door to the car, but Alexander kept pulling the door shut. At this point, Merrow put his hand through the open driver's side window and grabbed the steering wheel. Merrow stated that he grabbed the "steering wheel in hopes that if [Alexander] [went] to give [the vehicle] gas [Merrow] c[ould] overpower the steering wheel . . . long enough to where [Alexander] would rear-end the car [in front of him]." (*Id.*) However, Merrow was unable to keep control of the steering wheel. Merrow claimed that Alexander forced the wheel to the left and steered the vehicle onto the street. Merrow stated that he lost his footing and was dragged along the driver's side of the vehicle as Alexander continued to drive. According to Merrow, he was afraid to let go of the steering wheel.

Merrow claims that as he was gripping the steering wheel while Alexander was driving, he drew his weapon and fired twice into the vehicle. Merrow explained that "the only alternative means [he] had was to shoot [] Alexander to stop the car so [he] wouldn't get run over." (*Id*. at 379.) After he shot Alexander, Merrow "lost [his] grip falling from the vehicle. . . . [and] rolled away from it." (*Id*.)

Selective statements from witnesses were introduced into evidence and accepted by the district court. However, these statements from the witnesses and the testimony from Merrow do not and cannot paint a full picture of the events that took place that day in late January, as Alexander is not around to tell his side of the story. For example, we can glean important details from what the witnesses did not say. None of the witnesses claim they observed Alexander physically attack, assault, or threaten Merrow. Rather, the only thing they observed him do was to attempt to get away by leaving the scene. The district court carefully chose statements from Officer Sheri Tanner, who was seated in Merrow's police car during the incident, and Officer Jason Matthews, that supported Merrow's position. The district court, however, ignored pertinent details of the testimonial evidence, instead selecting only statements from the witnesses that supported Merrow's position.

Due to the self-serving nature of Merrow's testimony, the selective statements cherry-picked from the witnesses, and Alexander's inability to contradict this evidence, it is our duty as judicial officers to proceed with caution when weighing the evidence in a case like this. In fact, we are required on a motion for summary judgment to consider the facts in the light most favorable to the plaintiff and to make all reasonable inferences in the plaintiff's favor. As seen throughout the majority opinion and the district court's opinion, the evidence is not remotely considered in the light most favorable to Plaintiff.

**DISCUSSION**

### 1. Relevant Legal Principles

"[W]here a suspect 'poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify use of deadly force to do so.'" *Godawa v. Byrd*, 798 F.3d 457, 464 (6th Cir. 2015) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)) (reversing a grant of summary judgment on the basis of qualified immunity where there was a genuine issue of material fact as to whether suspect attempting to flee in police vehicle posed an actual and imminent threat). "'[A]s a general matter, an officer may not use deadly force once the car moves away, leaving the officer and bystanders in a position of safety.'" *Id.* (quoting *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014) (affirming a grant of summary judgment on the basis of qualified immunity where the officer shot a feeling suspect after the suspect accelerated towards a police officer and struck two officers with his car)). An officer "must have reason to believe that the car presents an imminent danger." *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005) (affirming district court's denial of qualified immunity where fleeing suspect in police car did not present serious threat of physical harm to the officer or others in the area).

### 2. Analysis

One of the serious deficiencies with the majority opinion is its failure to consider the facts in the light most favorable to Plaintiff and make all reasonable inferences in Plaintiff's favor. Merrow contends that he was in "imminent danger" of being run over by Alexander's vehicle. The majority agreed with Merrow and accepted his dubious contention that Merrow had an objectively reasonable belief that Alexander posed an imminent threat of serious physical harm to Merrow or others when he shot Alexander. Contrary to the majority opinion, the issue

in this case is whether Merrow actively and unnecessarily placed himself in a dangerous position in order to effectuate an arrest by grabbing and holding onto the steering wheel of Alexander's moving vehicle when Merrow's prior interactions with Alexander suggested that the driver would not have endangered others if he was able to drive away. It is notable that neither Merrow nor any of the witnesses at the scene claimed that Alexander engaged in any assaultive or threatening behavior toward Merrow. Indeed, Merrow's partner at the scene, Tanner, was not even concerned enough about what was occurring to get out of the police vehicle.

Viewing the facts in the light most favorable to Plaintiff, and under the totality of the circumstances, a reasonable jury could find that Merrow's use of deadly force violated Alexander's Fourth Amendment rights. The facts, viewed in the light most favorable to Plaintiff, demonstrate that Merrow "actively 'put himself in a dangerous position in order to effectuate an arrest'" by grabbing the steering wheel of the car in order to try to prevent Alexander from leaving. *Godawa*, 798 F.3d at 465−66. This action by the officer, in and of itself, was objectively unreasonable. No reasonable person, let alone a police officer, would grab hold of a steering wheel and continue to hold onto it as the car began to move, when nothing more was at stake than a minor ticket infraction. Merrow's explanation was that he wanted to steer the vehicle into a parked vehicle ahead in order to prevent Alexander from fleeing. Incredibly, Merrow claims he believed that ramming the moving vehicle into a parked car was safer than simply permitting Alexander to leave the scene and have him arrested later based upon information that Merrow had already obtained from Alexander in writing the citation.

The majority makes the outlandish claim that the officer feared for his life, and that is why it was reasonable for him to shoot Alexander. However, it is difficult to rationalize the officer's explanation when one examines the officer's own words. The notion that shooting

Alexander reduced any threat of imminent danger is completely ridiculous for many reasons. At the moment the shots were fired, it was objectively unreasonable for Merrow to shoot Alexander. For one thing, Merrow should never have attached himself to the side of a moving vehicle—it was not as though Merrow was attempting to detain or arrest a person whom he had reason to believe to be a dangerous felon. Secondly, Alexander's foot or body, after being shot, could have acted as a deadweight on the gas pedal and the car could have sped off into incoming traffic with no one alive behind the wheel.

This Court's previous opinions in *Godawa* and *Cupp* are informative and almost directly on point. In *Cupp*, this Court concluded that an officer was not entitled to qualified immunity for his use of deadly force against a man fleeing in a car. In that case, the police officer arrested the plaintiff, whom the officer perceived to be intoxicated, for making harassing phone calls in his presence. *Id*. at 769. The officer placed the compliant plaintiff in the back of his police cruiser while he went to talk with a tow truck driver about towing the plaintiff's vehicle. The plaintiff then moved from the back seat to the front seat and began to flee the scene in the police officer's vehicle. The plaintiff drove the police vehicle toward the officer and the tow truck driver. The officer moved out of the way of the vehicle and fired four fatal shots at the plaintiff as he drove past. The officer claimed that the plaintiff had directed the vehicle at him and the tow truck driver, and that he shot the plaintiff in self-defense. *Id*. at 770. The tow truck driver stated that the plaintiff may have redirected the vehicle in order to follow the direction of the road, rather than to target the officer and himself. *Id*. at 774. The tow truck driver also stated that the officer was "running toward the patrol car" when he fired shots at the plaintiff. *Id*.

After considering the evidence under the plaintiff's version of events, this Court concluded that the officer violated the plaintiff's constitutional rights. The Court stated:

> According to the plaintiffs' evidence, [the officer] shot Smith after the police cruiser was past [the officer] and there was no immediate danger to anyone in the vicinity. [The officer's] use of force was made even more unreasonable by the fact that Smith had been cooperative up to this point, and was arrested for the nonviolent offence of making harassing phone calls. Although there was some danger to the public from Smith's driving off in a stolen police car, the danger presented by Smith was not so grave as to justify the use of deadly force.

*Id.* at 773. In *Cupp*, under the plaintiff's version of events, the officer and the tow truck driver were not in danger at the time that the officer shot the plaintiff. The Court therefore concluded that, although the officer "[was] constitutionally permitted to put himself in a dangerous position in order to effectuate an arrest," a reasonable officer in his position "would not have perceived danger to anyone at the scene," including himself, under the plaintiffs' interpretation of the facts. *Id.* at 774. The plaintiff presented testimony from the tow truck driver that described the officer taking "four or five steps" toward the side of the police vehicle before firing shots at the plaintiff, and that stated that the officer was actually running toward the vehicle when he shot the plaintiff. The evidence presented by the plaintiff suggested that the officer was not in danger and did not need to "use deadly force to protect himself or others." *Id.*

In concluding that the officer was not entitled to qualified immunity, the Court explained that, "[a]lthough this circuit's previous cases give substantial deference to an officer's decision to shoot an unarmed suspect in a car chase, the officer must have reason to believe that the car presents an imminent danger." *Id.* at 775.

Likewise, in *Godawa*, a police officer, while on bicycle patrol, was informed that there might be an underage individual in the parking lot of a bar who was drinking. 798 F.3d at 461. The plaintiff was observed getting into a vehicle and driving from the back of the parking lot to the front of the lot. The officer approached the plaintiff in his vehicle and asked him if he had been drinking. The plaintiff said he had not been drinking, and that the beer bottle in the front

-11-

console's cup holder belonged to his girlfriend who was still inside the bar. After initially

denying that he had been drinking, the plaintiff admitted that the beer in the car was his and that

he had consumed one or two drinks at the bar. The plaintiff agreed to a field sobriety test, and

the officer told the plaintiff to hold on while he went back to his bike to request backup for the

sobriety test.

While the officer was requesting backup, the plaintiff started his vehicle and began to

back out of the parking spot, which knocked over the officer's bike. The officer yelled at the

plaintiff to stop multiple times, but he did not do so. The officer claimed that at this point he ran

along the driver's side of the car, with his gun drawn, to the front of the car's passenger side and

ordered the plaintiff to stop. The event that follows—when the officer and the plaintiff's car

allegedly come into contact—was disputed by the parties. The Court explained:

> Plaintiffs contend that Defendant was moving toward the car just prior to the impact "to block the exit," whereas Defendant claims that he was "target[ed]" by Godawa. While the lapel video clearly shows that Defendant and the vehicle came closer to each other, it is difficult to discern whether the car was driving toward Defendant, whether Defendant was moving toward the car, or both. In the Finish Line surveillance video, the precise moment of impact occurs just off-screen. In the seconds leading up to the impact, Defendant can be seen ahead and to the right of the front passenger side of Godawa's car. The car appears temporarily stopped at that point, having just finished backing out of a parking spot. As the car begins to pull forward, Defendant is seen advancing toward the car. The car then makes a right turn in the direction of the parking lot exit and, in the middle of the turn, Defendant seems to make contact with the car just off camera. This contact is suggested by Defendant's re-emergence on the video in which he seems to be moving off or pushing off the car and landing unsteadily on his feet. In his deposition, Defendant claimed that he was hit by Godawa's car "in the left leg about the knee" while the car was traveling at a speed of five to ten miles per hour. Defendant regains his balance quickly and appears to take three strides alongside the vehicle before shooting through the rear passenger-side window.

*Id*. at 461−62.

The Court concluded that, in considering the facts in the light most favorable to the plaintiffs, the video evidence "can reasonably be interpreted as indicating that Defendant was not directly in front of the vehicle, but rather was located ahead of the vehicle *to the right* of the passenger side during the relevant timeframe, and that the car never 'targeted' Defendant." *Id*. at 463. For purposes of the Court's qualified immunity analysis, the Court "assume[d] that Defendant was not actively struck by Godawa's car, but initiated the impact with the vehicle in his efforts to keep Godawa from fleeing[,]" and therefore concluded that "Godawa did not pose an immediate threat at the time Defendant discharged his weapon." *Id*.

In reaching its holding in *Godawa*, the Court recognized that the officer "actively 'put himself in a dangerous position in order to effectuate an arrest' by running alongside the car and using his body to try to block the exit." *Id*. at 465−66 (quoting *Cupp*, 430 F.3d at 774). The Court first noted that "Godawa never displayed any violence in his interactions with Defendant and never engaged Defendant in a physical struggle[,]" and "unlike the fleeing suspect in *Brosseau* [*v. Haugen*, 543 U.S. 194 (2004)], Godawa posed no discernable threat to the officers or to any other individuals at the time he was shot." *Id*. at 466.

Furthermore, the Court noted that "[p]rior to Godawa's flight, Defendant only suspected him of having an open container in his car and underage drinking." *Id*. at 466. The district court, however, determined that the officer had probable cause to believe that the plaintiff, at the time the shots were fired, had committed attempted murder, first degree assault, wanton endangerment, and fleeing and evading arrest in the first degree. *Id*. The Court explained that, although officers are entitled to consider felonies committed by a fleeing suspect after the flight has commenced in determining whether to use deadly force, the district court failed to view the facts in a light most favorable to the plaintiff because it based its conclusion on the officer's

account that assumed Godawa intentionally hit the officer with his car. *Id*. The Court thus held that "[w]ith the exception of fleeing and evading arrest, none of the offenses listed by the district court are applicable once the facts are viewed in the light most favorable to Plaintiffs." *Id*.

Like the officers in *Godawa* and *Cupp*, Merrow actively put himself in a dangerous position by gripping onto the steering wheel and not letting go once the car began to move. Merrow presented no evidence that Alexander was violent, that he had a gun or drugs in the car, or that he was going to drive recklessly on the road and endanger other drivers. The witness testimony did not suggest, prior to the officer grabbing the wheel, that Alexander was about to endanger individuals around the area. At most, one of the witnesses vaguely or ambiguously suggested that Alexander appeared to be driving toward a parked van or small truck. However, Merrow admitted that he was attempting to steer the car into a parked vehicle, so the fact that a witness thought that Alexander appeared to be driving towards a parked van should not count against Alexander.

Importantly, the interaction between Merrow and Alexander prior to the shooting was apparently civil and non-confrontational, and gave Merrow no reason to believe that Alexander would recklessly endanger others with his vehicle. Alexander was honest with Merrow about why he was at the house, and was not confrontational with Merrow when Merrow first told him to step out of the vehicle. When Alexander realized that his vehicle was going to be impounded, he begged Merrow to refrain from impounding his vehicle, and told Merrow that his wife would divorce him if he lost his car. Additionally, Merrow had all of Alexander's information when he began to flee, Merrow's partner was in their police vehicle, and another officer in a second police vehicle was also at the scene. It would have been easier, and safer, for the other officers to pursue Alexander in their vehicles, or to arrest him later at his residence.

Furthermore, prior to Alexander's attempt to drive away, Merrow only suspected Alexander of violating a local ordinance that prohibited loitering around alleged drug houses— an offense that is punishable by a citation and monetary fine instead of impoundment, as Plaintiff's lawyer pointed out at oral argument. It should also be noted that Merrow did not suspect Alexander of possessing drugs, or weapons, or any objects perceived as dangerous. Even assuming Alexander committed an additional offense by fleeing the scene, this offense alone does not justify Merrow's use of deadly force. *Cupp*, 430 F.3d 773 ("Although there was some danger to the public from [the suspect's] driving off in a stolen police car, the danger presented by [the suspect] was not so grave as to justify the use of deadly force.").

Similar to *Cupp* and *Godawa*, the district court failed to view the facts in the light most favorable to Plaintiff. Applying the *Graham* factors to Plaintiff's version of the facts, it is obvious that Merrow's use of force in this case was objectively unreasonable. Although Alexander was fleeing from police, he was suspected of a minor offense and was non-confrontational with Merrow prior to fleeing. More importantly, Merrow actively and inappropriately placed himself in a dangerous position even though Alexander posed no immediate threat to Merrow or any member of the public. In fact, Merrow was not too concerned about his safety if he was willing to attach his body to the outside of a moving vehicle. The problem with the outcome adopted by the district court and the majority is that it authorizes and encourages the irresponsible behavior demonstrated by Merrow. We should not approve of and support an officer's behavior when it is abusive, unreasonable, and indeed, senseless.

Although this case differs from *Godawa* and *Cupp* in that the officers in those cases had not attached their bodies to the vehicles in the same manner as Merrow, the principle from those

cases is applicable here—that an officer may not put himself or herself in a dangerous position when there is no need to do so in the first place, if the circumstances do not justify or warrant him or her in doing so, and then use that as an excuse to shoot the suspect. In other words, an officer should not be protected by qualified immunity when the victim poses no immediate danger to the officer or the public. Under the circumstances of this case, Merrow is not deserving of the protection granted by the qualified immunity doctrine. One can only conclude that the officer placed no value on the life of the deceased. The officer in this case acted in an objectively unreasonable manner, and needlessly cost a person his life. I therefore respectfully dissent.