RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ROBERT ALLEN SHUMATE,

*Plaintiff-Appellee*,

*v.*

CITY OF ADRIAN, MICHIGAN; JEREMY POWERS,

*Defendants-Appellants*.

⎤
⎥
⎥
⎥
⎥  No. 21-2795
⎥
⎥
⎥
⎦

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-10856—David M. Lawson, District Judge.

Argued: April 28, 2022

Decided and Filed: August 10, 2022

Before: SUHRHEINRICH, MOORE, CLAY, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Christian C. Huffman, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for Appellant. Robert G. Kamenec, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellee. **ON BRIEF:** Christian C. Huffman, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for Appellant. Kierston D. Nunn, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellee.

───────────────

## OPINION

───────────────

CLAY, Circuit Judge. In this civil rights action under 42 U.S.C. § 1983, Defendants Officer Jeremy Powers and the City of Adrian appeal the district court's denial of their motion for summary judgment on qualified immunity, state law immunity, and municipal liability

grounds. We hold that neither qualified nor state law immunity shields Officer Powers from liability. Consequently, we lack appellate jurisdiction to review the municipal liability claim against Defendant City of Adrian. The district court's denial of summary judgment to Defendant Powers is **AFFIRMED**, and Defendant City of Adrian's municipal liability appeal is **DISMISSED** for lack of appellate jurisdiction.

## I.  BACKGROUND

### A.  Factual Background

The following events giving rise to the three-count complaint occurred on September 27, 2019, in a CVS parking lot in Adrian, Michigan. The core of the resulting dispute happened over approximately four minutes and was captured on the officer's body camera. The video, along with the record as a whole, indicates that Powers deployed a Taser against Plaintiff three times (once in drive-stun mode) and applied physical force by allegedly kneeing, punching, and kicking Plaintiff.

On September 27, 2019, at 9:35 a.m., Officer Powers conducted a traffic stop on a Chevrolet Impala operated by Plaintiff's daughter, Amy Shumate. After Amy drove her vehicle into a CVS parking lot, Powers approached and informed Amy that the Impala's license plates were registered to an Oldsmobile and thus did not match the Impala's registration. Amy, visibly pregnant, told Powers she removed the license plates from her old, recently sold Oldsmobile and placed them on her Impala, which she had purchased in July. Amy further admitted that the Impala did not have valid insurance. Powers informed Amy he would have to impound the vehicle, "mainly for no insurance." (13:27).[1] He instructed Amy to exit the vehicle and "give somebody a call," presumably so the now vehicle-less Amy could be picked up. (14:30). The officer issued Amy an "over-the-counter" misdemeanor citation requiring Amy to pay a fee at the courthouse. When Powers asked Amy if she knew where the courthouse was, she responded, "I'm done answering your questions," to which the officer replied, "Okay, then go away." (14:59). While still in the vehicle and just out of the view of the body camera footage, Amy can be heard speaking to someone on her cell phone, asking "can you come get me." (14:59; *see*

---

[1]All citations to the body camera footage refer to the video recording's timestamp.

*also* Compl. R., 1, PageID # 4 ("[Plaintiff] responded to a telephone call from his daughter requesting a ride[.]")).

Officer Powers then says, his voice suddenly rising, "Do not start reaching in the car. Take yourself and walk over there. Stop resisting, or I'm going to arrest you." (15:09; Hr'g Tr., R. 49, PageID # 455 ("[T]here was really nothing remarkable about that transaction up to that point until she wanted to get some of her things out of the car, and then he kind of exploded at her.")). Amy tells the officer she is trying to gather her medical papers. Amy exits her vehicle, cell phone at her ear; Powers tells her to "go stand over there on the sidewalk," seemingly referring to the walkway in front of the CVS storefront, not the sidewalk adjacent to the street. (15:15). Amy replies, "you know what, I'll sit right there," apparently referring to the street-side grassy area. Powers says, "no, you're going to go stand over there." (15:17). Amy stops walking and faces Powers. The officer says, "I don't care—you'll go to jail. You want to push it?" (15:22). And, gesturing towards Amy's stomach, Powers says, seemingly referring to her pregnancy, "you think that's going to dissuade me? Go stand over there." (15:23). Amy walks towards the sidewalk abutting the drugstore. Officer Powers tells Amy to "grow up." (*See* Powers Dep., R. 21-3, PageID # 143 ("She was on the phone partially yelling at me, partially yelling on the phone, disparaging things, so . . . that's why I said it.")). Amy replies, "fuck you," prompting Powers to say, "you heard me." (15:35). Over the next six minutes, Powers searches the Impala and its trunk and gathers items for Amy's retrieval in preparation for the vehicle impoundment.

At timestamp 22:09, while Powers is gathering the particulars from the driver's side of the Impala, Plaintiff Robert Shumate, Amy's father, pulls his pickup truck into the lot. He stops in the parking spot adjacent to the Impala, and Officer Powers turns around and yells, "What?" to Shumate. Shumate exits his vehicle and yells to Powers, "You. You're the one that had a problem with me. You got a problem with me now?" Powers tells Plaintiff to "leave," and Plaintiff responds, "I ain't leaving nowhere[,] this is a private property." (22:18–:20). Powers then instructs Plaintiff to "stand over here" and not interfere with what he is doing. Some unintelligible dialogue is heard from Shumate and Amy before Shumate points to Powers and says, "You're an asshole. Yeah, you are." (22:29).

Off camera, Amy is heard saying, "I knew it was him, I knew it." (22:30). Shumate replies, "It's the same one, that's the one that threatened me at the house." (22:33).

It turns out that this was not Shumate's and Powers' first encounter. The record indicates two prior interactions. The first involved Shumate's son, who was in an argument over a car. Powers recalled knocking on Shumate's door, only to be "met with hostility," "unpleasant[ness]," and "very loud and very argumentative" yelling. (Powers Dep., R. 21-3, PageID # 141). However, Shumate did not appear to recall this prior incident. The other encounter was more recent and was more front of mind for the parties. "The week before this [CVS] incident," Shumate called the City of Adrian Police Department over a neighborhood spat. (R. Shumate Dep., R. 29-5, PageID # 262). Some tree branches and rosebushes had grown over the fence and onto Shumate's neighbor's property, and the neighbor trimmed the overgrowth. Shumate called the police, and Officer Powers was dispatched. Upon the officer's arrival, Plaintiff showed Powers a paper with the property line. Powers recalled informing Shumate that there was nothing the police could do to remedy a civil dispute; this answer made Shumate "visibly unhappy," and there was "[a] lot of yelling, screaming, [and] gesticulating," and Shumate snatched the papers back.[2] (Powers Dep., R. 21-3, PageID # 142). Their reunion in the CVS parking lot was not a happy one. (*See id.* at PageID # 140 ("I recognized his face [immediately] but I could not remember his name until later.")).

As Powers calls into his radio, Plaintiff says, "call backup, I don't give a fuck. . . . You can't do shit to me, cause I ain't done shit, motherfucker." (22:35–:42). Plaintiff continues, "do that on the car so we can get going." Powers responds, "don't tell me what to do." (22:45–:48).

The encounter escalates seconds later. Plaintiff, who had been standing toward the middle of the parking lot, near the sidewalk in front of the store, now turns to walk towards his pickup truck. (22:50). Although he ordered Shumate to leave forty seconds prior, Powers now yells, "stay out of your car, don't go near [the car]." (22:51). Shumate, standing near the bed of

---

[2]At the motion hearing, Plaintiff's counsel said that during this prior encounter, "[Shumate] became a little upset, [and he] snatched his papers back. And I think that was the extent of it. . . . He was just upset that this officer didn't do anything to help him." (Hr'g Tr., R. 49, PageID ## 451–52). There is no "claim that Powers was trying to retaliate against him as a result of [the prior encounter]." (*Id.* at PageID # 452).

his truck, yells, "fuck you," gives Powers the middle finger, but takes no step closer to his vehicle. The two are facing each other, a bit more than an arms-length distance apart. Powers tells Plaintiff to turn around and put his hands behind his back and reaches out to grab Shumate, but Shumate takes a few steps back, his arms slightly elevated near his side, avoiding the officer's grasp, stating, "I ain't done shit." (22:55–:56). At 22:58, Powers raises his Taser and yells, "put your hands behind your back right now . . . lie down." Shumate slowly backs away in the direction of the CVS and says, "I ain't doing shit cause I ain't done nothing." At timestamp 23:05, about 47 seconds since Shumate first arrived on the scene, Powers fires his Taser, and the probes strike Plaintiff in his chest, abdominal areas, and upper leg. Shumate falls backward, his head narrowly missing the sidewalk curb, and screams in pain. Powers' police report recalled the next few moments as follows:

> [Shumate] then fell backwards then rolled to his right, I ran to him and, with my Taser in my left hand, I switched the Taser to my right hand and attempted to take control of his left arm by grabbing it with my left hand. [Shumate] pulled his arm away from me by using his strength. I ordered [Shumate] to stop resisting. [Shumate] continued to actively resist me by using his strength to pull his arm away from me in an attempt to defeat my attempts to physically control him. [Shumate] then rolled to his back with his arms bent at the elbows in front of him. I had my Taser in my left hand and attempted to gain control of his left hand with my right hand by grasping it.

(Police Rep., R. 21-1, PageID ## 123–24; *see also* Powers Dep., R. 21-3, PageID # 147 (stating that he believed he delivered palm strikes against Shumate before the use of the second Taser)). Powers straddles the fallen and prone Shumate and tells him to "turn the fuck around" and "put your hands behind your back now." (23:09–:13; *see* A. Shumate Dep., R. 29-6, PageID # 275 ("He got to my dad, and he put his whole body on his chest . . . and he started just punching him with his fists.")).

At 23:20, Powers yells, "stop resisting," several times, though the video indicates no resistance by Shumate; in fact, Shumate again says, "I ain't done shit . . . I come down to get my daughter." (23:22). The officer yells for Shumate to "turn around," and Powers deploys his Taser again. (23:25). As explained in his police report, Powers "reenergized the Taser, by pulling the trigger, to deliver another exposure." (Police Rep., R. 21-1, PageID # 124). Powers drops the Taser, and Shumate cries out in pain before saying, "okay." (23:32).

For the next several seconds, the body camera footage is hard to follow, but it is clear that some physical scuffle is occurring, and it appears that Powers is punching and kneeing Shumate. (23:35).  The police report states:

> At this point I felt my hearing fade out and my vision got fuzzy.  I also felt my heartrate jump up.  I was afraid that he was going to strike me so I delivered palm heel strikes to [Shumate's] brachial plexus nerve cluster located on the left side of his neck.  [Shumate] continued to pull his arms away from me and was able to turn over onto his stomach.

(Police Rep., R. 21-1, PageID # 124; *id.* (stating he "delivered knee strikes to the side of [Shumate's] abdomen in an effort to gain compliance and get him to roll over"); *see also* A. Shumate Dep., R. 29-6, PageID # 276 (confirming she "observe[d] the officer punch [her] father in the ribs" and "slam his head down")).  Amy is heard yelling for Powers to "get off of" Shumate "now."  (23:38).  Powers speaks into his radio that he is "fighting with one," and Shumate says, "yeah, you're beating me up, and I ain't done shit."  (23:40–:42).  A third and final use of the Taser by Powers occurred around this time, now delivered in drive-stun mode to Plaintiff's abdomen.  Powers grabs Shumate by the collar and arm and screams three times, "turn over."  (23:45–:52).  Shumate says, "he's kicking me."[3]  (23:52–:55).  Plaintiff lies tilted leftward and says, "I know I ain't done shit.  I'm not doing nothing . . . I'm not resisting arrest.  I didn't do nothing."  (23:56–24:04).

Powers repeats into his radio that he is "fighting with one," and Shumate says, "get off of me.  I didn't do nothing, dude."  (24:07–:11).  Amy says, "do you know that he has medical problems," which Shumate confirms: "Yeah, I do, get up, please."  (24:10–:13).  Powers declines: "No.  You're going to jail now."  (24:13–:15).  Shumate replies, "I ain't going nowhere, I didn't do nothing."  (24:15–:17).  Powers yells at Shumate, who remains in a prone position, slightly on his left side, to "turn over."  (24:19).  Shumate says:  "I walked away from you, and you grabbed me."  (24:20–:22).  Powers again orders Shumate to turn over; Shumate says, "I ain't doing nothing," Powers replies, "all right," and Amy interjects, "he can't turn over. Help him."  (24:23–:26).

---

[3]It is undisputed that Powers struck Shumate by using palm-heel, backhand, and knee strikes.  However, Powers denied ever kicking Shumate.

After a brief pause, Shumate says, "I'll turn over, don't fucking shoot me again with that thing." (24:28–:31). Powers yells, "do not get up," and shoved or pushed Shumate before repeating, "do not get up." (24:33–:34; Police Rep. R. 21-1, PageID # 124 ("I then delivered back hand strikes to the brachial plexus nerve cluster on the right side of his neck to gain compliance.")). Powers shouts, "turn over, you motherfucker." (24:37). At this point in the video, it appears that Shumate is not lying down but kneeling with his hands and knees on the ground while Powers stands over him. Powers admits "deliver[ing] knee strikes to [Plaintiff's] left leg," and the video also appears to show some punching or kicking. (Police Rep., R. 21-1, PageID # 125). Amy yells in objection, saying, "hey . . . that's excessive force." (24:38; 24:43). A photograph taken by Amy shows Powers preparing to deliver a closed-fist punch to Shumate.

Police sirens, Powers' backup, can be heard in the background. (24:40). Powers yells, "stop resisting," and Shumate shouts in response, "I ain't resisting . . . Get off of me, I ain't resisting." Powers says, "lay down," and Shumate says, "I am," and Powers says, "no, you're not." (24:43–:54). Shumate appears to be kneeling on the ground, not lying down as instructed. Amy is heard saying: "How can he lay down, you got a hold of him, you dumbass, let go of him." (24:56). Powers, "using [his] body weight to hold [Shumate] down," (Police Rep., R. 21-1, PageID # 124) breathes heavily and passes his Taser from his right hand to his left hand, holding it casually in his left hand while radioing his location to backup. Shumate says, "all I said to you was, 'fuck you,' man. That's all I said to you, and you do this shit to me?"

Backup arrives. (26:20). Soon after, with the help of two additional officers, Shumate is handcuffed. (26:36).

The video continues for several more minutes. Though away from Shumate, Powers remained at the scene while his colleagues dealt with Plaintiff and Amy. Around 30:39, Powers recounts the incident to his colleagues, stating that Shumate is a "jerk." Plaintiff was placed on a gurney and taken in an ambulance; he was treated and released from a hospital. Meanwhile, Powers chatted with his colleagues about the possibility of impounding Shumate's truck; however, his colleagues dissuaded him. As the district court noted at the hearing on the motion for summary judgment: "[T]here was some section on the videotape where it sounded like

Powers was trying to find a reason to impound the pickup truck and as if he were trying to inflict more discomfort on [Shumate]." (Hr'g Tr., R. 49, PageID ## 453–54).

Plaintiff was charged with the felony of resisting and obstructing a police officer under M.C.L. § 750.81d(1). However, he later pled guilty to the misdemeanor offense of being a disorderly person in violation of M.C.L. § 750.165(1)(l). Powers also was disciplined after an internal affairs investigation into this incident. The two week suspension (one with pay, one without) resulted from "rudeness to a citizen," i.e., Amy Shumate. (Powers Dep., R. 21-3, PageID ## 136–37; *see also* Hr'g Tr., R. 49, PageID ## 445–46).

## B. Procedural History

On April 2, 2020, Plaintiff Shumate filed the instant complaint against Defendants City of Adrian and Officer Powers. The three-count complaint alleged an excessive force claim, municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and state law assault and battery claims. After discovery closed, Defendants timely filed their motion for summary judgment on January 15, 2021.

Following a hearing on June 17, 2021, the district court issued an opinion and order denying Defendants' motion for summary judgment. (Dist. Ct. Op. & Order Denying Mot. for Summ. J. ("Order"), R. 45). The district court held that material questions of fact existed precluding summary judgment as to Plaintiff's § 1983 claim against Powers, reasoning that the parameters of the force that Powers could reasonably utilize are clearly defined, such that a jury might conclude that Powers had exceeded those standards. The district court also denied Defendants' request for summary dismissal of Plaintiff's *Monell* claim against the City, ruling that a genuine issue of material fact existed as to whether Powers' alleged use of excessive force arose from the City's failure to properly discipline Powers for previous inappropriate behavior. The district court did not address Powers' assertion of statutory immunity on Plaintiff's state law assault and battery claims. Defendants now appeal and ask this Court to reverse and remand this matter for entry of summary judgment in Defendants' favor.

## II.  DISCUSSION

### A.  Standard of Review

We review a district court's denial of qualified immunity *de novo*. *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006).  An order denying "qualified immunity is immediately appealable only if the appeal is premised not on a factual dispute, but rather on 'neat abstract issues of law.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)).  Although a district court's factual findings are not reviewable on interlocutory appeal, "where a district court's denial of summary judgment may appear to be based on factual issues, we may nonetheless review that court's determination if it 'hinges on legal errors as to whether the factual disputes (a) are genuine and (b) concern material facts.'" *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 356 (6th Cir. 2013) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009)).  At the summary judgment stage, courts are required to "view the facts and draw reasonable inferences in 'the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)) (per curiam) (brackets omitted).  If the evidence would allow a reasonable jury to find in favor of a non-moving party, summary judgment may not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"There is, however, an added wrinkle" where the record contains "a videotape capturing the events in question." *Scott*, 550 U.S. at 378.  Because facts "must be viewed in the light most favorable to the non[-]moving party only if there is a '*genuine*' dispute as to those facts," we may not adopt a version of the facts that is "blatantly contradicted" by video footage that is not "doctored or altered in any way" and which clearly "depicts . . . [the events that] actually happened." *Id.* at 378–80 (quoting Fed. R. Civ. P. 56(c)) (emphasis added).  But we must nonetheless "view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff," *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017) (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)), and must also "make all reasonable inferences in their favor when undertaking the qualified immunity analysis on summary judgment," *Godawa*, 798 F.3d at 463; *cf. Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 783–84 (6th Cir. 2004) (Clay, J.,

dissenting) (concluding that where video footage is unclear and could support differing outcomes, courts should view the facts in the light most favorable to the non-moving party).

## B. Analysis

This appeal presents three issues. First, we determine whether, when viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude Defendant Powers used unreasonable force in violation of Plaintiff's clearly established Fourth Amendment right to be free from excessive force and is therefore not entitled to qualified immunity. Second, we review whether we have jurisdiction to consider the parties' arguments concerning municipal liability. Third, we ask whether Defendant Powers may be entitled to statutory immunity from state law liability, noting that the district court did not make an affirmative finding on this question.

### 1. Qualified Immunity

Plaintiff's excessive force claim is brought according to 42 U.S.C. § 1983 and alleges violations of the Fourth Amendment. In response, Defendant Powers asserts the affirmative defense of qualified immunity, claiming that the doctrine shields him from Plaintiff Shumate's claims. This case is not amenable to pretrial disposition because the record contains genuine disputes of material fact that preclude summary judgment at this stage.

Title 42 U.S.C. § 1983, enacted by Congress in 1871, sets forth the relevant statutory scheme. It does not confer any substantive rights. Rather, the statute supplies a federal cause of action against a person "who, under color of any statute . . . depriv[es] [another] of any rights, privileges, or immunities secured by the Constitution and laws." Section 1983's jurisdictional counterpart, 28 U.S.C. § 1343(a)(3), provides federal district courts with jurisdiction to oversee civil actions brought to "redress the deprivation . . . of any right, privilege[,] or immunity secured by the Constitution . . . or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." The Fourth Amendment, when invoked in connection with § 1983, provides the primary source of constitutional protection against excessive force by law enforcement officials. Most relevant for present purposes, it guarantees citizens the right to be secure in their persons against "unreasonable . . . seizures," including excessive force in making an arrest. U.S. Const. amend. IV.

However, the ability to go forward on a § 1983 claim against an officer for a violation of the Fourth Amendment  is "limited by the qualified immunity exception." *Ahlers v. Schebil*, 188 F.3d 365, 372–73 (6th Cir. 1999).  Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citations and quotations omitted).[4]

From the foregoing comes the familiar two-part test used to determine whether a law enforcement official is entitled to qualified immunity.  The first step is to determine if the facts alleged make out a violation of a constitutional right.  *Id.* at 232.  The second is to ask if the constitutional right was clearly established at the time of the alleged violation.  *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020).  For a case to merit submission to the factfinder, each question must be answered in the affirmative.  Otherwise, qualified immunity shields the officer from civil liability.

On appeal, Officer Powers asserts that he is entitled to qualified immunity because the force was not unconstitutionally excessive or, alternatively, that the law violated was not clearly established.  In analyzing both questions, the district court held that Powers was not entitled to summary judgment on his claim of qualified immunity.  We take each issue in turn.

### a. Constitutional Violation

"First, we must decide whether the facts . . .  adequately established a violation of [P]laintiff's constitutional rights to be free from excessive force . . . under the Fourth Amendment." *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019).  Excessive force during an arrest is unreasonable and violates the Fourth Amendment.  *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)).  This test of reasonableness has us consider three factors: (1) the severity of the crime at issue; (2) whether

---

[4]This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly[,] and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019) (quoting *Pearson*, 555 U.S. at 231).  This standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting another source).

the suspect posed an immediate threat to the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  These factors are non-exhaustive, and the ultimate question is whether "the totality of the circumstances justifies [the] particular sort of seizure" that took place.  *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) (brackets and ellipse omitted)).

Importantly, in determining whether the use of force in effecting an arrest is excessive in violation of the Fourth Amendment, we must determine "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  We consider "the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight," without regard to the underlying intent or motivation of the officer.  *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgment—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396–97.  In applying these standards, courts look "only to the facts that were knowable to the defendant officer[]" at the time.  *Reich v. City of Elizabethtown*, 945 F.3d 968, 979 (6th Cir. 2019) (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017)).

### i.  Severity of the crime

Turning to the three *Graham* factors recited above, the first, the severity of the crime at issue, weighs in Shumate's favor.  The district court summarized the pertinent facts: "[P]laintiff was charged with 'resisting and obstructing' a police officer and later pleaded guilty to disorderly conduct.  Nothing in the video record shows him being anything more than merely annoying and insulting toward Officer Powers before Shumate was shocked, tackled, and beaten."  (Order, R. 45, PageID # 427).  Accordingly, the district court held that the first *Graham* factor militated "against a finding that violent force was justified to effect the arrest."  (*Id.*).

Gauging the severity of an offense is not always a straightforward task, and the caselaw from this Circuit and our sister circuits employs various methods to determine an offense's severity. These approaches, and their applicability to the case at bar, are discussed below.

Many courts begin this inquiry by focusing on the classification of the offense, i.e., misdemeanor or felony.[5] Officer Powers submits that the first *Graham* test comes out in his favor because he asserts that Shumate obstructed Powers' inventory of Amy's Impala—and thus violated the felony obstruction statute—at least five times before the first tasing. Chronologically, Powers argues Shumate obstructed the inventory of Amy's vehicle by failing to comply with the orders: (1) to leave the parking lot; (2) to stand on the other side of the parking lot; (3) that he refrain from going near his pickup truck, instead continuing toward the truck and yelling "fuck you," and making a rude hand gesture; (4) to "turn around" and "put [his] hands behind his back;" and (5) to "put your hands behind your back now," but instead resisted and obstructed by fleeing across the parking lot, calling Powers a "motherfucker." After the first tasing, Powers argues that Plaintiff's behavior continued to meet the requirements of felonious resisting and obstructing a police officer by failing to comply with Powers' demands to put his hands behind his back and "stop resisting" and "stop fighting."

To start, the argument that a reasonable officer in Powers' position would have believed Shumate committed the *felony* obstruction statute is contradicted by the record. In Officer Powers' deposition, he stated that he was attempting to arrest Shumate "[f]or the city *misdemeanor* statute of opposing and obstructing an officer." (Powers Dep., R. 21-3, PageID # 140 (emphasis added)).

Even if Powers had probable cause to believe Plaintiff committed a felony, there was minimal (if any) connotation of violence by Plaintiff in this encounter. *See LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022) ("Indeed, there is no allegation that Plaintiff's offense was violent or otherwise resulted in any injuries."). A reasonable jury could conclude

---

[5]*Zuress v. City of Newark*, 815 F. App'x 1, 6 (6th Cir. 2020) ("Because the crimes a reasonable officer would have suspected plaintiff of having committed were non-violent misdemeanors without harsh penalties, the severity-of-the-crime factor weighs in plaintiff's favor."); *Thomas v. Plummer*, 489 F. App'x 116, 126 (6th Cir. 2012) (citation omitted) (holding that because the misdemeanor did not "create[] a risk of physical harm," the crime was not "a particularly serious offense").

that Powers' force was not justified against an individual thought to have committed a non-violent felony, suggesting a lesser level of force might have been reasonable in connection with an arrest for it. *Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015) (concluding that disputes of material fact existed over whether offense of disorderly conduct was a serious crime). Even if an "exchange . . . contain[ing] the use of profanity" amounts to resisting arrest under a state statute, such crime is not particularly severe. *Roe v. City of Cushing*, 13 F.3d 406 (10th Cir. 1993); *see also Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 472 (6th Cir. 2006) ("[D]isorderly conduct is not a violent or serious crime, and this fact weighs in favor of using less force in arresting [a suspect]."). A felony of resisting and obstructing that involves little more than hurling profanities is only moderately severe when judged from the perspective of a reasonable officer on the scene. *See Vanderhoef*, 938 F.3d at 277 (citing *Goodwin*, 781 F.3d at 322) ("Conduct that is not a violent or serious crime does not permit an officer to use increased force absent other factors.").

Additional methods courts use to assess the severity of the offense also tilt in Shumate's favor. The severity of a crime weighs in favor of a finding that the use of force was *not* excessive where an individual is suspected of being involved in an underlying felony, such as when an officer responds to an emergency call or is in pursuit of a known felon. *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 609–10 (6th Cir. 2020) (finding an offense severe where officer responded to complaint of domestic violence and arrived at the scene to find "a potentially deadly assault"); *Kirk v. Calhoun Cnty.*, 2021 WL 2929736, at *6 (6th Cir. 2021) ("Claudia's husband was suspected of assaulting a police officer with a firearm—a serious crime."); *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) (finding the first factor favored the officer because the plaintiff "was wanted for a felony at the time of the challenged use of force"). In this case, Shumate was not suspected of being involved in an underlying crime, nor was Powers responding to an emergency call of a person in distress or reporting that a dangerous individual was afoot. These points strongly counsel against the use of force exerted.

Lastly and relatedly, weighing the government's interest in subduing a suspect assists in our determination of an offense's severity; this question acts as a proxy for public safety

concerns. *See Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) (citations and brackets omitted) (asking "whether an officer had any reason to believe that the subject of a seizure was a potentially dangerous individual").[6]  Again, from this vantage point, the severity of the offense was low.  At worst, Shumate's behavior distracted Powers from completing Amy's vehicle impoundment, which was, in Powers' words, an "over-the-counter misdemeanor."  There was no "ongoing emergency" that Shumate's conduct "exacerbated." *Ames v. King Cnty.*, 846 F.3d 340, 348 (9th Cir. 2017) (determining the severity of the offense by focusing on "the serious—indeed, life-threatening—situation that was unfolding at the time"). Shumate's behavior was obnoxious and disrupting, possibly prolonging Powers' inventory search.  But it would strain credulity to classify Shumate's behavior as severe, especially given the low government interest at stake. *Cf. McCoy v. Myers*, 887 F.3d 1034, 1049–50 (10th Cir. 2018) (finding government interest in subduing suspect high and offense severe where police were advised suspect was armed and had two hostages).

In summary, the record does not indicate that any offense committed could properly be considered severe, meaning the first *Graham* factor weighs in favor of Shumate.  In fact, when judged from the perspective of a reasonable officer on the scene, without the benefit of hindsight, it is not even apparent what crime Shumate was suspected of having committed or when he committed it.  Similar doubts have led other courts to conclude that the first factor tilts in favor of the plaintiff. *See Newman v. Guedry*, 703 F.3d 757, 762 (5th Cir. 2012) (analyzing the first *Graham* factor and recognizing the presence of a factual question as to whether plaintiff committed a crime at all).  Accordingly, a reasonable jury could find that Powers had no reason to suspect Shumate of a crime, severe or otherwise, when he used force against Plaintiff.

---

[6]Our cases have also treated the government's interest in subduing a suspect as related to the broader issue of public safety concerns. *See Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009) ("Relatively speaking [speeding, DUI[,] and failing to appear] are not particularly serious crimes and none of them involve violence."); *Latits v. Phillips*, 878 F.3d 541, 549 (6th Cir. 2017) (holding that the first *Graham* factor favored a suspect because he was "suspected of possessing narcotics—not a violent crime"); *Graves v. Malone*, 810 F. App'x 414, 422 (6th Cir. 2020) (holding the first *Graham* factor cuts against a plaintiff when the plaintiff "was suspected of having committed a violent crime").

### ii. *The immediacy of the threat*

With regard to the second *Graham* factor—whether the suspect posed an immediate threat to an officer or others—the district court described the sequence of events, construing the facts in the light most favorable to Shumate, and found that a trier of fact could conclude that the use of force was objectively unreasonable. Specifically, the district court held that a "jury could conclude that a reasonable officer on the scene would not credibly have felt threatened by an unarmed suspect's mere attempt to comply with the officer's command issued just moments prior to leave the scene." (Order, R. 45, PageID # 424). Additionally, the district court acknowledged that Plaintiff was verbally antagonizing and "annoying and insulting," but that did not justify the use of force exerted. (*Id.* at PageID ## 423, 427). This factor came out in Plaintiff's favor since "nothing in his demeanor throughout the encounter evidences any manifest intention to engage physically with [D]efendant Powers—or even aggressively to approach him." (*Id.* at PageID # 423).

The question presented on appeal is whether Officer Powers could have reasonably considered Shumate to pose an immediate threat to officer safety at the moments that force was applied.[7] Powers asserts that a reasonable officer in his position would have been justified in perceiving that Shumate posed an immediate threat to officer safety. The facts considered in the light most favorable to Shumate tell a different story.[8] The encounter can be divided into two moments of constitutional import: before the first tasing and afterward. We take each in turn.

First, considering the events before the first tasing, Powers offers his version of the facts as follows: Shumate raced into the CVS parking lot with the engine of his truck revving,

---

[7]The second *Graham* factor often involves assessing the danger a suspect posed to law enforcement as well as others in the vicinity, such as passers-by. In this case, there is no suggestion by the defense that Shumate posed a danger to other civilians, so we focus only on the threat he may have posed to the officer.

[8]In a bit of a sideshow argument, Powers first says that his earlier encounter with Shumate (where the officer was dispatched in response to a disagreement between Shumate and his neighbor over a rosebush) indicated Shumate was easy to anger and, accordingly, informed his approach in the CVS parking lot. An officer's prior knowledge of a later-encountered arrestee or suspect is a relevant factor in this inquiry. *Latits*, 878 F.3d at 548; *Martin*, 712 F.3d at 958. But the rosebush incident would not give a reasonable officer a basis to believe that Shumate was a potentially dangerous individual. At most, all that prior event indicated was that Shumate was a defensive horticulturist and finicky neighbor—not that he had a propensity to pose a threat of physical violence to law enforcement.

screeched to a halt, jumped out of the truck, and immediately started yelling; it is asserted that rather than complying with Powers' command to leave, Shumate instead began to "pace[] menacingly back and forth throughout the parking lot," while yelling obscenities at Powers. (Def.'s Br., ECF No. 22 at 44). Powers' recitation of the facts continues: Shumate, despite having just refused to leave the parking lot ("I ain't going nowhere"), suddenly reverses course and walks toward his truck; Powers, fearful that Shumate plans to retrieve a weapon from the vehicle, tells him to stay away from the truck. Shumate curses ("fuck you") and makes an obscene hand gesture; Powers twice commands Shumate to "turn around" and "put your hands behind your back." Shumate does not, and Powers tases him.

Powers asks us to credit this re-telling and conclude that the initial use of the Taser was objectively reasonable. Such a conclusion would be unsupported, even under the officer's version of the facts.

An officer's use of a Taser is permissible where a suspect poses an immediate threat in the form of "violent[] thrashing," an "attempt[] to hit officers[,] or [by] mak[ing] a display of force." *Kent v. Oakland Cnty.*, 810 F.3d 384, 391 (6th Cir. 2016); *see also Rudlaff*, 791 F.3d at 640 (finding tasing reasonable where claimant "puffed out his chest and stared down [the officer]," then swung his arms twice at the officer). Shumate's behavior before he was tased does not fall into that camp. The video betrays no intent of Shumate to injure Powers. *Kent*, 910 F.3d at 391. To be sure, Shumate may have been minimally threatening insofar as his behavior was rude, annoying, untoward, and uncooperative. However, mere "agitated hand gestures" and profanity, unaccompanied by threats, fall short of the prototypical behavior that would make an officer fear for his physical safety. *See id.* (Powers Dep., R. 21-3, PageID # 144 ("Other than his irate behavior, the repeated instances of foul language directed at me, nothing—[Shumate] didn't verbalize any specific threat.")). Such a conclusion is particularly apt in this case, where the officer likewise displayed a penchant for profanity.

Powers also hopes to justify the first tasing by insisting that a reasonable officer would find objectively threatening Shumate's movement towards the truck for fear he intended to retrieve a weapon. This argument flies in the face of our caselaw and that of other circuits. A reasonable officer would not believe that Shumate posed an immediate threat of harm when there

was nothing—no evasive movements towards a waistband, no threats of violence, no charging towards the officer—suggesting possession or intent to possess a weapon. *Browning v. Edmonson Cnty.*, 18 F.4th 516, 526 (6th Cir. 2021) ("The jury could also rely on the absence of any evidence that [the officer] had reason to believe there was a firearm in the car."); *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1274 (10th Cir. 2022) ("[N]othing in the record shows the officers believed or had reason to believe that [the suspect] had a weapon or even that they asked if he was armed."). We do not credit an officer's subjective fear that an individual has a weapon where objective indicia are absent.[9] *Browning*, 18 F.4th at 528 ("[T]he remote risk that [the suspect] could have been armed does not establish that he posed a reasonable threat of danger."). A factfinder could rely on the total absence of evidence that Powers had a reason to believe a firearm was in the car. This inference would comport with Shumate's deposition testimony:

> Q. And despite that—and so he's investigating a crime and you decide that you're going to walk back to that vehicle, your vehicle, correct?
>
> A. Yeah, because he told me to leave.
>
> Q. You were going to go get into your vehicle and leave; that was your purpose?
>
> A. Yes, I was. I was going to leave.
>
> Q. While your daughter was there?
>
> A. Yes, because I wasn't going to get in it with him. I wanted to leave to avoid the confrontation with that officer.

(R. Shumate Dep., R. 29-5, PageID ## 264–65).

Powers' related argument that Shumate posed an immediate threat because Shumate disobeyed orders ignores the fact that Powers issued contradictory demands, telling Plaintiff to leave seconds before commanding him to not get in the car. A reasonable jury might find that Shumate's walking towards his vehicle complied with Powers' order issued seconds before to leave the premises. *See Wright*, 962 F.3d at 867.

Second, we now turn to Powers' uses of force after the first tasing, i.e., the additional Taser deployments and uses of physical force. Powers argues that a reasonable officer would

---

[9]The district court noted that "when the truck was searched" after the encounter, "no weapons were found." (Order, R. 45, PageID # 424). However accurate this is in retrospect, retrospection is not the correct perspective from which to assess a qualified immunity claim. *Fox*, 489 F.3d at 236.

have justifiably perceived that Plaintiff posed a serious threat to Powers' safety in the latter half of the encounter. According to Powers, "Plaintiff continued to wrestle with Powers and to thwart Powers' efforts to subdue and arrest [him] until Powers' backup arrived, at which point it took *two additional officers* to finally wrestle Plaintiff into submission." (Def.'s Br., ECF No. 22 at 46). Powers asserts a reasonable officer would have justifiably perceived that Plaintiff posed a serious threat to Powers' safety because he could not effectively subdue Plaintiff until backup arrived. Powers finds little corroboration in this account by way of the body camera footage, which perhaps explains why he devotes just a paragraph to defending this portion of the encounter.

A reasonable jury could find, as the video amply supports, that nothing suggested an immediate threat of harm to Powers. For one, Plaintiff does not appear to be offering much resistance, so these subsequent uses of force, particularly the punches and the kicks that can be heard clearly on video, were not needed to subdue Shumate. *Vette*, 989 F.3d at 1170 (finding no immediate threat because suspect was under the officers' control). The video also suggests that compliance with Powers' quickly issued and often contradictory commands was difficult since the officer was straddling Shumate, and thus Plaintiff may have been physically incapable of complying in the way Powers demanded. *See Wright*, 962 F.3d at 867. The record bears out this assumption. (A. Shumate Dep., R. 29-6, PageID # 276 ("He couldn't do nothing. The officer was sitting on him[,] and he had his hands across his chest like this and blocking his face.")).

What is more, the video shows Powers (while straddling Shumate) communicating with police dispatch with relative ease. The district court found that: "[Powers] swapped his [T]aser to an unready position in his left hand, holding the weapon by the business end, against the [P]laintiff's chest, obviously within the [P]laintiff's immediate reach, in order to casually retain the [P]laintiff with one arm, while using his free hand to activate his radio." (Order, R. 45, PageID # 425). Even acknowledging that "[o]ne of the most dangerous moments for a police officer is just before a suspect is handcuffed . . . [and remains] unrestrained," *Cunningham v. Mich. State Police*, 852 F. App'x 178, 180 (6th Cir. 2021), the fact that Powers was ineffective in

handcuffing Shumate without assistance from other officers does not demonstrate that Shumate posed an immediate threat.

Finally, Powers' citation to this Court's decision in *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604 (6th Cir. 2020), does not support the result he seeks. In that case, a panel of this Court found the suspect posed an immediate threat to officer safety where the individual failed to "obey [the officer's] order to roll over so he could be arrested," "kicked towards the officers," and "attempted to stand up." *Id.* at 611, n.3. Multiple Taser deployments failed to immobilize the *Kapuscinski* plaintiff, so it was reasonable for the officer to believe that the plaintiff was "out of control." *Id.* Powers tries to analogize *Kapuscinski* to the instant appeal, asserting that the uses of the Taser and physical force were not effective in immobilizing Shumate, making it reasonable for Powers to believe that Plaintiff posed an immediate threat to his safety. Such a reading would stretch the holding in *Kapuscinski* beyond recognition. In that case, "[t]he officers had just seen [Kapuscinski] violently assault and threaten to kill [a woman,] and he was refusing to comply with their instructions to roll over so that he could be safely apprehended." *Id.* That suspect "looked crazed and dangerous and . . . ready to attack." *Id.* 610–11. Unlike the suspect in *Kapuscinski*, whom the officers just observed commit a violent assault, there was no independent basis to form an objectively reasonable belief that Shumate posed an immediate threat.

To conclude this subsection, we draw insight from a frequent refrain of federal courts: "Not every push or shove [by a police officer], even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396). In this case, the converse rings true: Not every profane uttering or rude gesture by a free citizen, even if it may seem unnecessary to a police officer, justifies using force on an otherwise non-threatening individual. Under these circumstances, Shumate posed a minimal safety threat, and the second *Graham* factor weighs against the use of force deployed since the force used did not match the threat Shumate presented. The district court did not err in its consideration of the second *Graham* factor.

### iii.  *Resistance to arrest or evasion of arrest by flight*

The third and last *Graham* factor is whether the suspect was actively resisting arrest or evading arrest by flight.  The district court found that

> Although the [P]laintiff did retreat and withdraw his arm to evade Powers'[] grasp, his reaction fairly could be viewed by the jury as merely noncompliant rather than resistant.  He also attested that after he was pinned on the ground by Officer Powers, he only kept his arms in front of him and attempted to maintain an all-fours posture to avoid being slammed into the ground by Powers, who was bearing down on him with his considerably greater weight.[10]  Shumate's reaction fairly can be viewed as not comprising any of the typical sorts of aggression that characterize "active resistance" according to the decisions on point.

(Order, R. 45, PageID # 424 (citing *Kapuscinski*, 821 F. App'x at 612)).

"When a suspect actively resists arrest, the police can use a [T]aser (or a knee strike) to subdue him; but when a suspect does not resist[] or has stopped resisting, they cannot."  *Rudlaff*, 791 F.3d at 642.  Active resistance has been found where "some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance."  *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013).  Conversely, "[i]f there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance."  *Id.* at 535 (holding that a man driving erratically who crashed into a concrete barricade and refused to obey officer commands to exit his vehicle until he was tased was not actively resisting arrest).

On appeal, the parties dispute whether Shumate's behavior amounts to active resistance or evasion by flight.  The facts present two periods of possible resistance: first, the time leading up to Officer Powers' initial firing of the Taser, and second, the period in which Shumate was lying on the ground after the first Taser deployment.  Taken in the light most favorable to Plaintiff, his passive noncompliance was not paired with any moments of active resistance or evasion by flight.

---

[10]Powers is 5'8", 225 pounds.  Shumate is 5'10", 145 pounds.

The constitutional analysis for the first period turns on whether Shumate was actively resisting or evading arrest by flight, rendering the initial discharge of the Taser objectively reasonable. To facilitate our review, we subdivide the first part of the encounter into three constituent parts, namely, when Shumate pulled his arms away from Powers; backed away from the officer, with his arms slightly elevated; and hurled various invectives at Powers. The moments immediately preceding the first tasing do not reveal any active resistance on the part of Shumate.

Powers argues that Plaintiff actively resisted arrest when he pulled his arms away from the officer. Shumate admits that he did not comply with Powers' commands to present his hands to be handcuffed. However, it is settled in this Circuit that noncompliance alone, without "other acts of defiance," *Rudlaff*, 791 F.3d at 641, is not sufficiently "active" opposition to justify the use of a Taser to subdue a subject who does not otherwise present any immediate threat to officer safety. Indeed, "the fact that a suspect does not immediately surrender does not inherently mean that he is resisting." *LaPlante*, 30 F.4th at 580 (citing another source); *compare Goodwin*, 781 F.3d at 324 (finding a "single statement that he would not [comply with the officer's orders did] not in itself render Officer['s] use of the Taser reasonable."), *with Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 511 (6th Cir. 2012) (holding that officer did not violate clearly established law when he used Taser five times in drive stun mode to subdue plaintiff, who refused to be handcuffed, fled from officers, and was "out of control," breaking windows and jumping on top of cars due to what officers later learned was crack cocaine intoxication). Additionally, Shumate had not been told he was under arrest prior to being tased, so his resistance, if it was resistance at all, was merely passive, rendering unreasonable the first use of the Taser less than a minute after his arrival on the scene. *Wright*, 962 F.3d at 867–68; *see also Gradisher v. City of Akron*, 794 F.3d 574, 585 (6th Cir. 2015).

Moreover, nowhere in this portion of the encounter does Shumate indicate evasion of arrest by flight. Even assuming, for purposes of argument, that Powers might have reasonably perceived Shumate as attempting to flee at some point (an assumption that is, in our approximation, plainly unsupported), he took no further action evincing flight when the Taser was used. The video shows Plaintiff slowly back away from his truck, thus complying with

Powers' command to not get in the vehicle. This behavior does not constitute flight. *See Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (finding no resistance where the suspect took a step backward).

While this Court has found that a "verbal showing of hostility" can signify active resistance, such a finding would not map onto the facts of this instant case. *Eldridge*, 533 F. App'x at 535; *see also id.* at 534–35 (noting that verbal hostility can indicate active resistance, such as where it was "the final straw in a series of consciously[] resistive acts"). Shumate's verbal jabs and rude hand gestures were not threatening in a manner that would amount to active resistance absent something more, such as overtly threatening language. *Cf. Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012) (finding active resistance where the suspect threatened to "fight[] the police" and implied he had a gun and intended to kill himself).

The constitutional analysis of the second period of possible resistance turns on whether Shumate actively resisted arrest when Powers tased Plaintiff twice more and kneed, kicked, and punched him (or, as Powers testified, used backhand, palm-heel, and knee strikes). This portion of the video is harder to follow, but it again betrays no evasion by flight or active resistance by Shumate. Plaintiff, prone on the pavement and screaming in pain from the first Taser deployment, is told by Powers to "turn the fuck around," and the Taser can be heard continuing to deploy. Seconds later, Powers shouts, "stop resisting," and Shumate says, "I ain't done shit." A few seconds later, after Shumate says, "I come down to get my daughter," Powers deploys the Taser for a third time, in apparent response to nothing other than Shumate's verbal protests. Shumate cries out in pain, and Powers yells, "turn around," and Plaintiff replies, "okay." Then, Powers delivers multiple strikes to Plaintiff's upper body and torso while yelling, "turn the fuck around." Powers calls for backup, stating that he is "fighting with one," and Shumate says, "yeah, you're beating me up." Powers grabs Shumate by the collar and commands him to "turn over" multiple times, and Shumate cries, "he's kicking me," before saying, "I know I ain't do shit. I'm not doing nothing. I'm not doing nothing," and "I'm not resisting arrest, I didn't do nothing." Only after these uses of force does Powers tell Shumate, "You're going to jail now." (24:13).

Within this period, there are two moments of particular import for present purposes: before and after Powers told Shumate he was under arrest.

To start, taken in the light most favorable to Shumate, a reasonable officer faced with the same circumstances could not have determined that Shumate's actions bore the hallmarks of active resistance. *See Kelly v. Sines*, 647 F. App'x 572, 575 (6th Cir. 2016) (citations omitted) (quoting another source) ("[W]hen a plaintiff's actions do 'not follow the typical course of active resistance,' we are more inclined to deny qualified immunity."). A reasonable jury could conclude that Shumate's physical behavior (lying prone) indicated submission and that his verbal statements (saying "okay," "I'm not resisting," and "I'll turn over, don't fucking shoot me again with that thing") indicated compliance.

To be sure, Plaintiff admits that he failed to readily offer his arms for cuffing.[11] However, this action does not reflect a "deliberate act of defiance using one's own body," *Eldridge*, 533 F. App'x at 535, such as might be true where a suspect actively resists arrest "by kicking, flailing, and wriggling away from [the officers'] grasp." *Roell v. Hamilton Cnty.*, 870 F.3d 471, 482 (6th Cir. 2017). The moment Powers applied the Taser for the third time is particularly jarring, given that Shumate appeared to be doing nothing other than lying on the pavement under Powers' weight. "Whatever 'active' means, it has to mean something more than mere silence and inaction." *See Browning*, 18 F.4th at 526–27. Such a finding accords with the record; Powers wrote in his police report and confirmed in his deposition that, at this point, Shumate "passively resist[ed], I mean he was just using his body weight, just dead weight, not rolling himself over." (Powers Dep., R. 21-3, PageID # 147). A jury could conclude that no reasonable officer would believe that Plaintiff was actively resisting arrest.

The suggestion that Shumate's behavior amounted to an act of defiance is diminished for another reason: he was not told that he was under arrest until after Powers tased him three times and used physical force. "The general consensus among our cases is that officers cannot use force . . . on a detainee who . . . is not told he is under arrest, or is not resisting arrest." *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009) (citing another source). Were we to credit Powers'

---

[11]Shumate testified that he kept his arms in front of him so Powers "could [not] smash [his] face in the ground." (R. Shumate Dep., R. 29-5, PageID # 266).

version of the facts, the severity of the use of force is plainly disproportionate to the level of noncompliance offered by Shumate.  Indeed, a reasonable jury could conclude that as the incident progressed—and with each subsequent use of force by Powers—any potential threat Shumate presented decreased.

In sum, our analysis of the three *Graham* factors leads to the conclusion that the officer's use of force was not objectively reasonable considering the totality of the circumstances.  The objective facts, when viewed in the light most favorable to Shumate, show that the severity of the offense (assuming there was one) was quite low; he posed no immediate threat to officer safety; and he offered nothing more than verbal belligerence or passive noncompliance.  Accordingly, the district court did not err in finding that a reasonable jury could find that Powers violated Shumate's Fourth Amendment right to be free from excessive force.

### b.  *Clearly Established*

For purposes of qualified immunity, it is not enough that an officer violates a plaintiff's constitutional rights; instead, to prevail on the excessive force claim, Shumate must also show that Powers' use of force amounted to a violation of Shumate's clearly established rights—the second prong of the qualified immunity analysis.  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks and brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"As a starting point, [Plaintiff] had a clearly established right to be free from excessive force." *Palma v. Johns*, 27 F.4th 419, 442 (6th Cir. 2022) (citing *Godawa*, 798 F.3d at 463). However, while "this general right is well known, the right at issue is not defined at such 'a high level of generality.'" *Id.* (quoting *Godawa*, 798 F.3d at 467).  Stated otherwise, a plaintiff need not always put forth "a case directly on point" to show that his claimed rights were indeed clearly established at the time of the conduct. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam).  That is because "courts 'ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted.'" *Palma*,

27 F.4th at 442 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867, 198 (2017). Plaintiff need not show that "the very action in question has previously been held unlawful, but . . . in light of pre-existing law, the unlawfulness [of the official action] must be apparent." *Creighton*, 483 U.S. at 640 (1987).

By 2019, when this incident occurred, the right to be free from physical force when one is not actively resisting the police was clearly established. *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010); *Griffith v. Coburn*, 473 F.3d 650, 659–60 (6th Cir. 2007) (noting that it was clearly established that officers may not use gratuitous violence against an individual who "pose[s] no threat to the officers or anyone else"). It was also clearly established in this Circuit that an individual has a constitutional right not to be tased when he is not actively resisting. *Browning*, 18 F.4th at 525. Consequently, Powers violated those rights by tasing Shumate three times and using physical force where Plaintiff was not engaged in active resistance. *Id.* Under Shumate's version of the facts, there was no indication that he committed a severe crime, posed an immediate threat to Powers, or attempted to evade arrest by flight or resisted arrest.

Because the right to be free from being tased and subjected to physical force (in the alleged form of punching, knee strikes, kicking, and hitting) while not actively resisting and while being non-violent was clearly established prior to 2019, Powers was on "notice that his specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8. Thus, a reasonable jury could find that Powers violated Shumate's clearly established right to be free from excessive force. The district court properly denied Powers qualified immunity for the § 1983 claim.

### 2. Municipal Liability

Defendant City of Adrian appeals the district court's denial of summary judgment on Shumate's *Monell* claim. *See Monell*, 436 U.S. at 692. "Although not appealable as a final decision under 28 U.S.C. § 1291, an appellate court can exercise pendent appellate jurisdiction on a § 1983 claim alleging municipal liability where the municipality's motion for summary judgment is inextricably intertwined with the qualified immunity analysis properly before the Court." *Lane v. City of LaFollette*, 490 F.3d 410, 423 (6th Cir. 2007) (internal quotation marks omitted). A pendent appellate claim is "inextricably intertwined" with a properly

reviewable claim on collateral appeal "only if . . . appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Mattox v. City of Forest Park*, 183 F.3d 515, 524 (6th Cir. 1999) (internal quotation marks omitted). In this case, resolution of Powers' appeal does not necessarily determine the extent, if any, of Defendant City of Adrian's municipal liability. Because the district court correctly denied Defendant Powers' motion for summary judgment on the basis of the qualified immunity doctrine, we lack pendent appellate jurisdiction over Defendant City of Adrian's interlocutory appeal of the denial of its summary judgment motion. *Martin*, 712 F.3d at 963.

### 3. State Law Immunity

The final issue on appeal concerns Shumate's state law claims of assault and battery against Officer Powers, and Powers' resulting argument that governmental immunity shields him from suit. Assault and battery are intentional torts under Michigan law. *People v. Reeves*, 458 Mich. 236, 240 (1998).[12] A police officer has immunity from tort liability. M.C.L. § 691.1407(2). To enjoy this governmental immunity, an officer must establish: (1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority; (2) the acts were subjectively undertaken in good faith, that is, without malice; and (3) the acts were discretionary, rather than ministerial in nature. *Odom v. Wayne Cnty.*, 482 Mich. 459, 461 (2008); *Ross v. Consumers Power Co.*, 420 Mich. 567 (1984). "In other words, Michigan state law imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity." *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015). On appeal, Powers asserts that all elements have been satisfied, and therefore, he is entitled to immunity from Plaintiff's assault and battery claims. Plaintiff concedes the first and third prongs but contends the acts were not taken in good faith.

---

[12]Michigan law defines "battery" as an "intentional, unconsented[,] and harmful or offensive touching of the person of another, or of something closely connected with the person." *Reeves*, 458 Mich. at 240. It defines "assault" as "either an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *Id.* (quotations and citations omitted).

In this case, the parties presented arguments on the merits regarding statutory immunity in their briefing before the district court. However, the court did not rule on Plaintiff's state law claims and made no mention of Powers' statutory immunity defense.

"[W]e normally decline to rule on an issue not decided below." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 576 (6th Cir. 2013) (quoting another source). Still, we may exercise pendent appellate jurisdiction where the state law claim "is inextricably intertwined with the immunity analysis." *Browning*, 18 F.4th at 529. Because the state law tort claims rise and fall with the officer's federal qualified immunity defense, and since the parties set forth detailed arguments below and on appeal, the question of governmental immunity is properly before this Court. *McKenzie v. City of Detroit*, 74 F. App'x 553, 556 (6th Cir. 2003) (assuming jurisdiction where state law claim was "factually and legally intertwined with [plaintiff's] federal excessive force claim").[13]

Having found that Powers' actions are not shielded by qualified immunity, we conclude that Powers is not entitled to governmental immunity under state law. *Hunt v. Massi*, 773 F.3d 361, 372 (1st Cir. 2014) (citation omitted) ("The determination of the reasonableness of the force used under § 1983 also controls the determination of the reasonableness of the force used under the common law assault and battery claims."). For the reasons explored in the § 1983 analysis, a reasonable trier of fact could find Officer Powers liable for the intentional torts of assault and battery. *Martin*, 712 F.3d at 963 ("[R]esolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983[.]") The use of force—in the form of multiple Taser shocks, beating or hitting, and arm and leg strikes—could be deemed unreasonable, not undertaken in good faith, and with willful disregard for the possibility of harm. *Brown*, 779 F.3d at 421. As with the federal law claims,

---

**13***Compare Wright*, 962 F.3d at 878 (quoting *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) ("When federal qualified immunity and Ohio state-law immunity under Ohio Rev. Code § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of federal qualified immunity analysis.'"), *and Brennan v. Twp. of Northville*, 78 F.3d 1152, 1158 (6th Cir. 1996) (quoting another source) ("[T]he two appeals are coterminous because [the] federal and state law claims against the City—to the extent the state law claim references the alleged constitutional violation—are both premised on his claim that Defendants violated his [constitutional rights]), *with Thompson v. City of Lebanon*, 831 F.3d 366, 371 (6th Cir. 2016) ("We likewise lack pendent appellate jurisdiction to review the district court's denial of summary judgment on the plaintiff's state-law claims.").

Shumate relies on facts that are in dispute, and if a jury were to believe Plaintiff's version, Powers would not be entitled to governmental immunity for Shumate's intentional tort state law claims.

## CONCLUSION

For the reasons stated above, the district court's denial of summary judgment to Defendant Powers is **AFFIRMED**, and Defendant City of Adrian's municipal liability appeal is **DISMISSED** for lack of appellate jurisdiction.